**Oswald PIQUION Plaintiff,**

v.

**WALGREEN, CO., d/b/a Walgreen, Co., Store 3679, Defendant.**

**Oswald Piquion, Plaintiff,**

v.

**Walgreen, Co., d/b/a Walgreen, Co., Store 3679, Defendant.**

**Nos. 03–22968–CIV, 04–20757–CIV.**

United States District Court, S.D. Florida.

April 29, 2005.

Roberta Fulton Fox, Miami, FL, for Plaintiff.

Lori Anne Brown, Patrick F. Martin, Littler Mendelson, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

UNGARO–BENAGES, District Judge.

THIS CAUSE is before the Court upon Defendant, Walgreen Co.'s, Motion for Final Summary Judgment filed January 21, 2005. Plaintiff, Oswald Piquion, filed his response on February 4, 2005, to which Walgreen replied on February 14, 2005. The matter is ripe for disposition.

THE COURT has considered the motion, the pertinent portions of the record and is otherwise fully advised in the premises.

### PROCEDURAL HISTORY

On July 23, 2001, Piquion filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 150–A1–2906. The parties conducted mediation in February of 2003. On May 8, 2003, Piquion filed an additional administrative complaint for retaliation with the EEOC. The EEOC then issued Piquion a right to sue letter on August 15, 2003 for the administrative complaint filed on July 23, 2001. On November 7, 2003, Piquion filed a four count complaint ("Complaint I") in this Court alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* including: (I) disparate treatment based on

his Haitian origin; (II) hostile work environment; (III) retaliation under Title VII; and (IV) retaliation for filing a workers compensation claim pursuant to Fla. Sta. § 440.205. On February 2, 2004, this Court declined to exercise supplemental jurisdiction over Count IV of the complaint because it raised novel and complex issues of Florida law.

On February 24, 2004, the EEOC issued Piquion another right to sue letter for the additional administrative complaint filed by Piquion on May 8, 2003. Piquion then filed a two-count complaint (Complaint II) in the Circuit Court of the 11th Judicial Circuit in and for Miami–Dade County, Florida on March 2, 2004. In Complaint II, Piquion alleged a claim for retaliation under Title VII resulting from the filing of his original discrimination charge and a claim for retaliation for filing a workers compensation claim pursuant to Fla Stat. § 440.205. Walgreen removed Complaint II to federal court and this Court accepted transfer from Judge Martinez on April 30, 2004. Again, this Court declined to exercise supplemental jurisdiction over Piquion's workers compensation retaliation claim because it raised novel and complex issues of Florida law. On August 5, 2004, the Court consolidated Piquion's remaining retaliation claim in Case No. 04–20757 with his three-count complaint in Case No. 03–22968.

### FACTS

The Court recites the following facts taken from the parties' statement of uncontested facts in the Joint Pretrial Stipulation ("JPS") and from viewing the record in the Plaintiff's favor. Piquion was born in Haiti and is of Haitian descent. (JPS at 6.) In March of 2000, Piquion began his employment with Walgreen at Store No. 3679, located at 161 N.E. 54th Street, Miami, Florida. *Id.* At the time, Plaintiff was a full-time student and therefore his work schedule was limited to after 3:00 p.m.

during weekdays. Mocrieffe, Piquion's first manager, hired him as a service clerk. (Pl.'s Dep. at 26.) Piquion's duties included receiving merchandise from delivery trucks, carrying merchandise from the stock room to the sales floor and stocking it on the store shelves. (Pl.'s Dep. at 26–28.) He was also responsible for cleaning the store's bathrooms. (Pl.'s Dep. at 27.) During this time, Piquion worked between twenty to thirty hours per week.

Piquion has worn various colored hats throughout his employment with Walgreen. Piquion claims that the colored hat is representative of his Haitian culture and the voodoo religion. (Pl.'s Dep. at 99.) Piquion also wears his hair with dreadlocks which Piquion considers sacred and therefore wears his colored hat to cover them. (Pl.'s Dep. at 100.) Piquion's hat never became an issue while Moncrieffe was the manager. (Pl.'s Dep. at 91.)

In July of 2000, Jorge Rosario became Piquion's manager. Prior to Rosario becoming manager, Moncrieffe had employed an outside company to wax and polish the store's floors. (Pl.'s Dep. at 104.) When Rosario took over he discontinued using the outside company and instructed Piquion to wax the floors to reduce Walgreen's costs. (Pl.'s Dep. at 105.) Piquion objected to this additional duty. (Pl.'s Dep. at 101–02.) Rosario then had the floors waxed by a Hispanic employee from another Walgreen location and eventually returned to having the job performed by an outside company. (Pl.'s Dep. at 103.)

Sometime in March of 2001, Piquion suffered an injury while working in the stockroom at Walgreen when another employee dropped a box that landed on him. (Pl.'s Dep. at 33, 79.) From that point on Piquion could no longer lift or push heavy objects. (Pl.'s Dep. at 33–34.) This restricted his ability to perform certain duties such as receiving merchandise from

the delivery truck or carrying merchandise to the sales floor to be stocked. (Pl.'s Dep. at 34.) Thus, Piquion was relegated to stocking merchandise after other employees brought it out to the sales floor for him. (Pl.'s Dep. at 34.) After this injury, Piquion's hours began to be reduced. (Pl.'s Dep. at 174.)

Piquion alleges that the first act of discrimination occurred on March 24, 2001. (Pl.'s Dep. at 79.) On that day, upper management from Walgreen came by to visit the store. (Pl.'s Dep. at 88.) The assistant manager, Gary Parker, instructed Piquion to go the stockroom and remain there until Parker came and got him. (Pl.'s Dep. at 88.) Parker told Piquion that Rosario wanted him placed in the stockroom because of his appearance and the hat he was wearing. (Pl.'s Dep. at 90.) Piquion followed Parker's orders and remained in the stockroom for approximately thirty minutes until Parker told him that the upper management had left. (Pl.'s Dep. at 89.)

The very next day a similar incident occurred. (Pl.'s Dep. at 93.) This time, Parker approached Piquion and told him to go to the break room and remain there until further notice. (Pl.'s Dep. at 94.) Piquion went to the break room and, like before, Parker returned after upper management left and told Piquion he could leave the break room and return to work. (Pl.'s Dep. at 94.) Piquion never spoke to Rosario regarding either of the incidents. (Pl.'s Dep. at 91, 94.)

Shortly after these incidents, Thadeus Warner replaced Rosario as Piquion's manager. (Pl.'s Dep. at 87–88.) Warner was Piquion's manager at the time he filed his claim with the EEOC on July 23, 2001. (Pl.'s Dep. 87–88; Wamer Dep. at 4.) After he filed his complaint with the EEOC, Piquion's hours were further reduced. (Pl.'s Dep. at 175.) Piquion and Walgreen then met for mediation on October 11, 2001. Piquion's hours were reduced again. (Pl.'s Dep. at 175.)

In May of 2002, Yader Castillo replaced Warner as Piquion's manager. (Castillo Dep. at 4.) Under Castillo, Piquion's hours were further reduced. (Pl.'s Dep. at 123.) Piquion approached Castillo and requested additional hours. (Pl.'s Dep. at 122–23.) Castillo told Piquion that he would give him more hours and offered to train Piquion to operate the register. (Pl.'s Dep. at 138.) Piquion refused because he did not trust Castillo based on the number of times Castillo had disciplined him in the past. (Pl.'s Dep. at 138.) To date, Piquion is the only employee in the store that is not trained to operate the register. (Pl.'s Dep. at 138.) Walgreen continues to employ Piquion and at present he averages between five to ten hours per week. (Pl.'s Dep. at 144.)

### LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-

moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997); *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981).[1] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine,' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes,* 398 U.S. at 160, 90 S.Ct. 1598. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505.

## ANALYSIS

### I. Title VII National Origin Discrimination, Case No. 03–22968

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of, among other qualities, such employee's race, religion, or national origin. 42 U.S.C. § 2000e–2(a)(1). Piquion asserts three forms of discrimination in violation of title VII:(1) disparate treatment; (2) hostile work environment; and (3) retaliation. The Court addresses these claims in turn.

### A. Disparate Treatment

Walgreen asserts that Piquion has failed to establish a prima facie case of unlawful origin discrimination. Specifically, Walgreen contends that Piquion failed to suffer a tangible adverse employment action as a result of origin discrimination and that Piquion was not treated less favorably than similarly situated employees.

Absent direct evidence of discrimination, such as statistical proof, a plaintiff may rely on circumstantial evidence to establish discriminatory intent. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a framework for plaintiffs to establish a prim facie case of origin discrimination. *Id.* at 802–04, 93

---

**1.** Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

S.Ct. 1817. A plaintiff must demonstrate: (1) that he belongs to the protected class; (2) that he was entitled or qualified for his position; (3) that he was subjected to adverse employment action; and (4) that the employer treated similarly situated employees outside his classification more favorably. *McDonnell,* 411 U.S. at 802–04, 93 S.Ct. 1817; *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997); *Hinson v. Clinch County, Georgia Bd. of Educ.,* 231 F.3d 821, 828 (11th Cir.2000). The parties do not contest that Piquion is part of a protected class or that he was qualified for his position. However, the parties do dispute whether Piquion suffered an adverse employment action or whether he was treated less favorably than similarly situated employees outside of his class.

### 1. adverse employment action

■ An adverse employment action must be tangible in order to be actionable under Title VII, *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Mere reassignment to a more inconvenient position is insufficient. *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994). A plaintiff "must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001) (emphasis by court). Additionally, a plaintiff's subjective view of the seriousness and materi-

ality of the employer's actions is not controlling. *Id.*

In *Davis,* the plaintiff claimed he suffered adverse employment action because the employer placed negative performance memorandums in his file and changed a number of his employment duties. *Davis,* 245 F.3d at 1240. The Court found that neither action caused the plaintiff to suffer any economic injury and accordingly affirmed the district court's decision to grant the defendant's motion for summary judgment because the plaintiff failed to establish adverse employment action as a matter of law. *Id.* 1240–41.

■ Here, Piquion claims the adverse employment action consisted of: (1) being confined to the stockroom on two occasions; and (2) having the added duty of waxing the floors. Piquion also urges the Court to consider that he sought to work the register, but Rosario refused because of Piquion's origin.[2] (Pl.'s Dep. at 137, 173).[3] However, even accepting the above three actions by Walgreen as true, it is clear that Piquion has failed to state a prima facie case of adverse employment action. In *Davis,* it was at least arguable that the negative performance memorandums could cause the plaintiff economic injury by hindering future job prospects. Here, the impact of Walgreen's actions amount to nothing more than a bruising of Piquion's ego. Congress did not intend such actions to implicate Title VII liability. *See Davis,* 245 F.3d at 1240. Accordingly, even accepting his facts as true and viewing the record in his Piquion's favor, the Court concludes that he has failed to dem-

**2.** The Court notes that the only basis for this in the record is Piquion's claim that the assistant manager, Parker, told Piquion that Rosario had informed him that Piquion was not permitted to work the register In *Macuba v. Deboer,* 193 F.3d 1316 (11th Cir.1999), the

court held that "inadmissible hearsay *cannot* be considered on a motion for summary judgment." *Id.* at 1322–23.

**3.** Piquion does not claim disparate treatment on the basis that his hours were reduced.

onstrate an adverse employment action as a matter of law.

### 2. similarly situated employees

 In addition to demonstrating adverse employment action, a plaintiff must also demonstrate that he was treated less favorably than similarly situated employees outside the protected class. The similarly situated employee that the plaintiff identifies "must be similarly situated 'in all relevant respects.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir.1994)). In his response, Piquion offers nothing more than conclusory statements that no other employee was treated the same way. Piquion also makes reference to the fact that new employees receive more hours than he does. However, he fails to specifically identify an employee for the Court to consider when evaluating his claim. The Court finds it doubtful that Piquion could identify a similarly situated employee in light of his physical limitations caused by the stockroom injury. As such, the record is void of facts upon which a reasonable juror could find that Piquion suffered adverse employment action within the meaning of Title VII and Piquion has failed to identify a similarly situated employee who was treated more favorably. Therefore, the Court finds that Walgreen is entitled to summary judgment with respect to Piquion's disparate treatment claim.

### II. Hostile Work Environment

 Title VII's antidiscrimination provisions "strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations ommitted). A prima facie hostile work environment claim under Title VII requires proof that "'the workplace is permeated with discriminatory intimidation, ridicule. and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367). An employee alleging a hostile work environment must prove (1) that he belongs to a protected group, (2) that he has been subject to unwelcome harassment, (3) that the harassment was based on a protected characteristic of the employee, such as race, religion, or national origin, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. *Id.*

In this case, there is no dispute that the first, second and fifth factors have been demonstrated. The Court accepts that Piquion was born in Haiti and is of Haitian descent. (JPS at 6.) The Court also accepts for present purposes that Piquion was confined to the stock room and break room on orders from Rosario and thus subjected to unwelcome harassment for which Walgreen is vicariously liable. Nonetheless, Walgreen is entitled to summary judgment on Piquion's hostile work environment claim because there are no facts on the record that demonstrate the harassment was based on Piquion's national origin or that the harassment was sufficiently severe or pervasive to alter the terms the terms and conditions of employment and create a discriminatorily abusive working environment.

There are three incidents where Piquion claims he was harassed based on his national origin. The confinement to the

stockroom, the confinement to the break room and being assigned to wax the floors.

*Stockroom/Break room incidents*

■ Piquion claims he was confined to the stockroom and break room because he refused to take off his hat when Walgreen upper management visited the store. Because the hat is representative of his Haitian origin, Piquion contends, Rosario confined him to the stockroom and break room because he is Haitian. The Court disagrees with Piquion's claim because there is nothing in the record to establish a nexus between the hat and his Haitian origin or that Rosario was aware the hat represented Piquion's Haitian origin. When asked if Rosario understood the significance of his hat, Piquion responded "I don't know if he knew or he didn't know." (Pl.'s Dep. at 100–01.) In fact, there is nothing on the record that indicates anyone, other than Piquion, understood his hat to be a symbol of his Haitian origin. (Mason Dep. at 28.) Because the record is void of evidence, direct or indirect, that demonstrates Rosario understood Piquion's hat was a symbol of his Haitian origin it logically follows that Piquion has failed to produce any evidence indicating that his confinement to the stockroom and break room was based on his Haitian origin. *See LeBlanc v. TJX Companies, Inc.,* 214 F.Supp.2d 1319, 1332 (S.D.Fla.2002) (granting summary judgment in favor of employer on plaintiff's hostile work environment claim where plaintiff failed to provide facts evidencing a correlation or connection between the harassment and plaintiff's national origin).

*Duty to wax the floors*

■ The Court reaches the same conclusion with respect to Piquion's assignment to wax the floors. There are no facts on the record that evidence Rosario ordered Piquion to wax the floors based on his Haitian origin. To the contrary, the

record evidences quite the opposite. During his deposition, Piquion stated that Rosario instructed him to wax the floor because "the company wasn't making any money, and that they needed to save money." (Pl.'s Dep. at 101.) The Court notes that during his deposition Piquion failed to even claim, much less provide any evidence. that Rosario ordered him to wax the floors on account of his Haitian origin. Therefore, the Court concludes that Piquion has failed to demonstrate a nexus between his confinement to the stockroom and break room, and his duty to wax the floors with his Haitian origin.

■ Piquion's failure to satisfy the third factor under *Miller* entitles Walgreen to summary judgment on his hostile work environment claim. However, even if Piquion had satisfied this that factor, Walgreen would still be entitled to summary judgment because the acts of harassment on the record are not sufficiently severe or pervasive so as to have altered the terms and conditions of Piquion's employment and create a discriminatorily abusive working environment as a matter of law. To establish that the harassing conduct was actionably severe or pervasive a plaintiff must establish a subjective and objective component. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir.1999). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms of employment, and this subjective perception must be objectively reasonable". *Id.* (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). When analyzing the objective component, the Eleventh Circuit has stated that the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance. *Mendoza,* 195 F.3d at 1246 (citing *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir.1997)) (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Using these factors, a court must look at the totality of the circumstances to determine whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiffs employment and thus create an abusive working environment. *Id.*

In *Mendoza,* the plaintiff was a female employed by the defendant corporation between December 1993 and April 1995 as both a temporary and full-time employee. *Mendoza,* 195 F.3d at 1242. Following her termination in April 1995, the plaintiff brought suit under Title VII alleging that the following acts perpetrated by her supervisor constituted a hostile work environment: "(1) one instance in which [the supervisor] said to [the plaintiff] 'I'm getting fired up'; (2) one occasion in which [he] rubbed his hip against [her] hip while touching her shoulder and smiling; (3) two instances in which [he] made a sniffing sound while looking at [her] groin area and one instance of sniffing without looking at her groin; and (4)[his] 'constant' following and staring at [her] in a 'very obvious fashion.'" *Id.* at 1247. Upon the defendant's motion, the trial court entered summary judgment against the plaintiff and this judgment was affirmed on appeal by the Eleventh Circuit sitting en banc. The appeals court found first that the plaintiff had failed to present evidence that her supervisor's conduct was physically threatening, humiliating or that his actions had the cumulative effect of interfering with her job performance. *Id.* Next, the court held that "none of the conduct alleged by [the plaintiff] is severe." *Id.* at 1249. Third, the court found that these four incidents and her supervisor's " 'constant' following and staring" occurred over an eleven-month period and, as a matter of law,

were therefore too infrequent to alter the terms or conditions of her employment. *Id.* (citing *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365–66 (10th Cir. 1997) (holding that five sexually harassing statements during a sixteen-month period of time were insufficient to establish a hostile work environment)). Finally, the Court found that the plaintiff's allegations of being constantly followed or watched by her supervisor, while frequent, were insufficient under Title VII to create a jury question regarding the hostility of her work environment. *Id.* at 1249 & n. 8.

Here, the harassment endured by Piquion falls well short of the conduct which the court in *Mendoza* found insufficient to survive summary judgment. Piquion has worked for Walgreen for five years. In that time, he cites to three acts of discrimination; the stockroom and break room incidents and his duties to wax the floors. Prior to these incidents and since then, there is nothing on the record evidencing discriminatory conduct towards Piquion. In addition to the infrequency of the incidents, it seems clear that nothing about them was severe or physically threatening. Although he was instructed to stay in the stockroom and break room, he was not physically locked in and after the brief confinement he returned right to work. (Pl.'s Dep. 97–98.) Furthermore, it appears that other than the period of his actual confinement, the alleged discriminatory conduct did not interfere with his ability to work.

Similarly, Rosario's ordering Piquion to wax the floor is unremarkable and appears no more severe than an objective person would view any order given by a supervisor to an employee. While the Court will accept that Piquion subjectively perceived these actions as severe and pervasive, objectively they are clearly not. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367 (holding that discrimination laws are only implicated in

the case of a workplace that is "permeated with discriminatory intimidation, ridicule and insult."). Viewed in their totality, the Court concludes that the conduct is insufficiently severe and pervasive to have altered the terms of Piquion's employment and create an abusive work environment as a matter of law. Therefore, the Court finds that Walgreen is entitled to summary judgment on Piquion's hostile work environment claim because there are no material facts on the record that demonstrate (1) that the harassment was based on his national origin and (2) that the harassment was sufficiently severe or pervasive to have altered the terms and conditions of his employment thereby creating an abusive work environment.

## III. RETALIATION

To establish a prima facie case of retaliation, an employee must show (1) that he engaged in conduct protected by statute; (2) that he suffered an adverse employment action; and (3) that the adverse action was related causally to the protected expression. *Weeks v. Harden Manufacturing Corp.*, 291 F.3d 1307, 1311 (11th Cir.2002). Under the *McDonnell Douglas* framework and at the summary judgment stage, upon establishing a prima facie case of retaliation the employee then shifts the burden to the employer to articulate a nonretaliatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817. If the employer is able to do so, the employee must then prove that a reasonable trier of fact could find that this rationale was a mere pretext for a discriminatory action. *Id.*

▮ In Count III of Complaint I, Piquion alleges that after he filed his administrative complaint with the EEOC on July 23, 2001, Walgreen retaliated against him by reducing his hours. In Count I of Complaint II, Piquion claims that his hours were further reduced after he filed

his second administrative complaint with the EEOC on May 8, 2003. There is no dispute that Piquion filed a charge of discrimination with the EEOC, as is his right under Title VII, and that subsequent to the filing, his hours were reduced. Based on the temporal proximity between his filing with the EEOC and his reduction in hours, the Court concludes that Piquion has established a prima facie case of retaliation.

▮ Defendant, however, has established through the depositions of Piquion and Rosario, that Piquion's hours were reduced because of the injury he suffered months before he filed the EEOC claim. The burden now shifts to Piquion to establish a genuine issue of material fact as to the pretextual nature of this rationale. Piquion relies, almost entirely, on the EEOC's investigative report to support his claim that a genuine issue of material fact exists. Contrary to Piquion's assertion, "there should be no confusion that [the EEOC] cannot usurp the judiciary's role in determining whether there is a genuine issue of material fact." *Williams v. Alabama Indus. Dev't Tr'g,* 146 F.Supp.2d 1214, 1224 (M.D.Ala.2001) (citing *Dickerson v. Metro. Dade County,* 659 F.2d 574, 579 (5th Cir.1981)); *Bynum v. Fort Worth Indep. Sch. Dist.,* 41 F.Supp.2d 641, 659 to demonstrate that Walgreen's reason for the reduction in hours was pretextual for its retaliation. The Court finds the facts, viewed in the light most favorable to Piquion, belie his retaliation claim.

Before Piquion's accident, his duties included receiving merchandise from the trucks. placing it in the stock room, transferring it to the sales floor and then placing the it on the sales racks. (Pl.'s Dep. 26–28.) During that time his hours ranged between twenty to thirty hours per week. After his injury in March of 2001, Piquion's hours were reduced. (Pl.'s Dep. 32–35.) This reduction in hours took place

months before Piquion filed his claim with the EEOC. Piquion's hours were reduced because he could no longer lift merchandise from the truck or from the stock room to the sales floor. (Pl.'s Dep. at 34.) His injury relegated him to placing the merchandise on the store shelves after other employees brought it to the sales floor for him.[4]

Piquion also is a full time student. This limits his availability because he cannot work before 3:00 p.m. on weekdays. (Pl.'s Dep. at 12–13.) Furthermore, when Piquion complained about his lack of hours, the manager at the time, Castillo, offered to have him trained on the register because, in light of his physical limitations resulting from the accident, the tasks Piquion could perform were limited. (Pl.'s Dep. at 142.) Castillo also offered to have him work on Sundays. Piquion refused both offers.

Therefore, on the record before the Court, it appears that, contrary to Piquion's claims. Walgreen has done its best to accommodate Piquion with respect to his injury and his request for additional hours. Piquion has failed to identify a material fact on the record that would demonstrate Walgreen's stated reasons for reducing his hours were pretextual for its retaliation against him for the filing the administrative claims with the EEOC. As such, Walgreen is entitled to summary judgment on both of Piquion's retaliation claims. Accordingly, it is hereby

ORDERED AND ADJUDGED that Walgreen's Motion for Summary Judgement is GRANTED.

---

**4.** Additionally, the Court notes that Piquion has received raises under each manager while working at Walgreen. (Pl.'s Dep. at 53.)